The first case on our docket is United States of America v. Nicholson. Mr. Hightower. Come forward. Come forward. May it please the court. Counsel Officer. I consider it an extreme privilege and honor to stand before you today and represent Carl Nicholson. My name is K.C. Hightower. I practice law in Mississippi. My office is in Gulfport. I am accompanied today by my law partner Brian Sawyers for whom I am grateful. Carl Nicholson did not get a fair trial in the lower court. I have an enormous amount of respect for the trial judge in that case, but the fact remains that the trial that Mr. Nicholson participated in was fatally defective. Its principal infirmity rests with the government's misuse principally through the Internal Revenue Service of summary testimony offered by a summary witness by the name of Bradley Luker. Mr. Luker had not been designated as an expert prior to trial, but nevertheless offered what is essentially expert testimony throughout trial. He also improperly adopted, endorsed, deferred to, and essentially bolstered the testimony of witnesses who were hotly contested and who offered strongly disputed testimony. Interestingly, the government had designated an individual by the name of Lisa Wansley, but chose for some reason not to call Ms. Wansley. Mr. Luker was the last witness at trial, and Mr. Luker gave what was essentially a first closing argument. Mr. Luker was allowed to essentially regurgitate the testimony of prior witnesses, witnesses who had cooperation agreements with the United States, and witnesses who themselves, in several instances, were offering opinions. Counsel, I think you are focused on the most difficult issue in the case, not necessarily the only one of some relevance to our deliberations. A couple things on what you've said so far. First, it wasn't clear he was going to be the last witness in the case, but it did work out that way in some of the cases in which it's been found that the summary witness really was just giving early closing argument. I think it was probably a rebuttal witness, unlike the situation here. But more importantly, it seems to me that this is a case of exactly the kind that a summary witness makes sense for. What would you say is where this particular summary crossed the line? Principally, to the extent that he basically collaborated with Frank McWhirter, who was a partner of Mr. Nicholson's at Nicholson and Company at the time. It's an accounting firm by the name of Todd McWhirter now. He approached Mr. McWhirter and asked Mr. McWhirter to opine as to whether or not certain charges would be a reimbursement policy. Then, based upon that opinion, he rendered an opinion as to what were false charges. Agent Luker's opinion, number one, he shouldn't have been given an opinion. He had not been designated as an expert. Number two, he certainly should not have been able to give an opinion based upon the opinion of a hotly contested witness. That's where he went wrong initially. With respect to whether or not he was a rebuttal witness, with all due respect, I think that's less significant because he was the last witness. He didn't appear somewhere to talk about testimony such as a particular number appears on a form. He took it one step further and he said, and that is false. He also referenced testimony of John Lee. John Lee was a lawyer in Hattiesburg, Mississippi, who was indicted and pled guilty to felonies. John Lee's testimony was also hotly debated. Agent Luker, in summarizing John Lee's testimony, basically testified in a manner that was inconsistent with what Mr. Lee had previously testified to. Mr. Lee insisted, at trial at least, that $66,000 in checks that he had written to Carl Nicholson was for accounting fees and that Mr. Lee would satisfy accounts receivable. And he was adamant about that. Now, whether that was right or whether that was wrong, certainly a summary witness is at best just that. Summarizing prior testimony, well, that wasn't a testimony of Mr. Lee. Mr. Lee went off the rails on the government at trial, and a reading of the transcript reflects that. They tried mightily to get him back on the track and met with, I think, minimal success. But in so doing, Agent Luker stepped outside the bounds again of what's allowed under the rules. This court has used very strong language and multiple opinions about summary witnesses, and we will readily concede that they have their place. If Mr. Luker had taken the stand and identified, I don't want to say undisputed facts or facts beyond controversy, but let's say he'd gotten them testified to what the sum total was of checks that appeared in a check ledger, or let's say that he had testified to what the final taxable income was as reflected on the form based on the evidence that had been adduced previously in trial, we would have a lot less arguments about what he did. He got on the stand. He collaborated with a hotly contested witness. He developed an opinion that Carl Nicholson was guilty, and he told the jury that Carl Nicholson was guilty, and it was because I say so. The IRS is not a body that certainly didn't need help at trial. They could have offered an expert. The government argues now that this was a complex trial. They cite some cases where they were 17 days long. This case was, I think, a four-day trial, and if it had been so complex, they certainly could have called Ms. Wansley. They chose not to, and instead they went with Mr. Luker. Mr. Luker, oddly enough, it required Mr. McWhorter. I know the court probably noticed from the transcript that Mr. McWhorter even blurted out during trial, can somebody tell me what I'm looking at with respect to the documents that had been presented to him that Mr. Luker testified about. Over objection, Mr. McWhorter was able to take those documents home, review them, and then Mr. Luker was able to opine later in the trial about his conversations with Mr. McWhorter and how they had violated firm reimbursement policies. This was clearly improper. This case is on point with the Hart case. I know the government probably disagrees with that and certainly shares a lot of similarities with the Price case that we've identified in our briefing. The curatives that the court, I guess, attempted to give, we noted during the trial we believe were ineffective, and that is essentially because, in a similar vein, this court, we believe, stands for the proposition that when summary witnesses are allowed to basically run wild the way Mr. Luker was, there is only one curative, and that's a new trial. You know, the government makes a passing reference to objections and things like that. Suffice it to say that had I made any more objections, I don't know that I'd have been able to continue with the trial. I would have been talking so much, and we had multiple bench conferences. I think I walked the trench between my table and the bench, and we had multiple motions for mistrial. We made objections that not only cited or objected to certain testimony, we cited this court's holdings because we anticipated that this might happen prior to trial the way things had proceeded prior to trial, particularly at the pretrial conference. There is only one remedy in this case, judges, and that is to grant Mr. Nicholson a new trial, and if the Internal Revenue Service and the Department of Justice want to retry Mr. Nicholson and go through the proper procedural hoops, then, you get it, but what they did in Hattiesburg, Mississippi, in February of 2019, substantially interfered with Mr. Nicholson's rights. I mean, this is not a matter of, this is just an evidentiary snafu. This denied the man a fair trial, you know, all the way down to, and we even pointed out, Special Agent Luker looking the telling them that based on what Frank McWhirter told him, he had decided that an element of the case had been met, that the statements were false. Well, they make, the government observes that, in one instance in their brief, that certain holdings require an express statement that I believe somebody. Number one, we don't believe that that's what it holds, but number two, even if it did, certainly when Agent Luker stared those people down and said, I talked to Frank McWhirter, Frank McWhirter said they violated the policy and so they were false, it certainly wouldn't communicate to the jury that he didn't believe Mr. McWhirter. He would not have been offering that opinion based on non-belief, I don't think, so he, at a minimum, if not expressly, implicitly to Mr. McWhirter, who again, was the subject of a cooperation agreement and was staring down the barrel, at the time at least, and I guess presumably still could be, of being prosecuted himself. You couple that, and I'll briefly touch on some of the other things, the other errors that were present in trial, you know, John Lee was a 40 or 50 year practicing lawyer in Hattiesburg and had a very tragic kind of fall, and in testifying, made reference that Mr. Nicholson had been subpoenaed to testify before the grand jury but didn't go. We, of course, objected and I think moved for a mistrial, if I'm going to spend what probably is a very short balance of his life in a federal prison, and the government dismisses that as an off-the-cuff statement. Unfortunately, when the government rested and the jury was exiting the jury box, the trial judge informed the jury, and I may be misquoting Judge Sterritt to some degree, that when they returned, that Mr. Nicholson would either put on his case or that they would hear from Mr. Nicholson. Suffice it to say, Mr. Nicholson has no obligation to put on a case, and the court recognized that, and we don't suggest that it's anything other than inadvertent. I have practiced before Judge Sterritt for a long time. I know it was inadvertent, but it was nevertheless damaging. You couple that with another statement by a judge that also was incorrect, particularly within the confinement. I'm not even sure that's correct with respect to a civil audit, but it's certainly not correct with respect to a criminal prosecution. Any of those things in isolation might fairly be criticized as making a mountain out of a molehill, but in the aggregate, they were damaging. They were certainly damaging when you basically had the IRS sitting as the determiner of credibility of witnesses, the ability to not only restate previous testimony, but to put a spin on it. One instance I recall was when Mr. Luker delved into testifying about the calculation of outside basis, which a couple of CPAs at trial testified is one of the more complicated undertakings an accountant can come across. He said that Mr. McWhirter had confirmed, I believe, the $150,000 figure. I'm not sure that he ever said that he confirmed that Mr. Nicholson's outside basis in the accounting firm was that testimony. Mr. Luker was advocating at that point, and he was invading the province of the jury. He did not limit his testimony to observable facts that the jury could have assessed for their credibility. He overstepped his bounds. He poisoned the trial. He blew toxic gas. Good morning, your honors. And please, the court. Joseph Severson for the United States. The district court was well within its scope of evidence in this factually complex tax case. Fourteen witnesses testified over four days of trial, and over 150 documentary exhibits, comprising over 2,600 pages, were admitted into evidence. And the defendant was charged with 11 tax crimes, 10 of which related to different false returns that he filed for himself or assisted his client, John Lee, in filing. And the superseding indictment alleged that these returns were false in various ways, which varied depending on the type and the year of the return. IRS Special Agent Bradley Luker, who testified both as a fact witness to things that he learned during his investigation and as a summary witness, summarized some of the evidence supporting these various charges. Agent Luker, testifying with reference to summary charts. His testimony throughout was generally tied to summary charts that helped organize the evidence for the jury. He testified with reference to two summary charts. You can find those on page 30 and 33 of the government's brief. These charts listed the various items at issue in some of the tax returns that were charged as false. And Luker's summary testimony related the already admitted evidence that showed the defendant and Lee's returns were false to the particular charges in the indictment. Luker also testifying with reference to another set of summary charts, one of which you can find on page 35 of the government's brief, summarized trial evidence that was drawn from several different sources that, when put together, showed the defendant had incurred the additional expenses that he and his family had charged in his American Express account. The defendant claims that Agent Luker inaccurately summarized the evidence that John Lee's 2014 corporate return falsely deducted $66,000 in payments. But the trial evidence, as Agent Luker testified, was that the $66,000 was a personal expense rather than turning it over to his accounting firm. And the evidence established that Lee did not, in fact, owe a debt to the defendant's firm for accounting services. And Agent Luker, furthermore, never actually testified that this $66,000 in payment was for a personal expense. He never said that John Lee testified to that. The only thing that he said was a personal expense were some of the other charges that were summarized on that account, or on that exhibit. And that's the John Lee items summary exhibit. And those were the so-called Robert Jackson items. Those were the payments that John Lee, through his law firm, made to his trust and estates attorney, Robert Jackson, to pay his personal life insurance policies. The defendant also claims that Agent Luker mischaracterized trial witness Franklin Warder's testimony when he said that McWhorter confirmed the $150,000. But this was an accurate summary of McWhorter's testimony regarding the defendant's claim that he had an additional $150,000 in outside basis from his initial investment in his accounting firm. McWhorter testified, you can find this at page 1075 of the record, that, quote, I recall it being $150,000, end quote. And, quote, it was at the time his, certainly, capital investment and basis, end quote. So that was a completely accurate summary of what McWhorter had testified to. Now, a defendant claims repeatedly that Agent Luker offered expert opinions as to the falsity of the items on the return. But we submit that he did no such thing. Just as the district court found in denying the defendant a new trial, all that Agent Luker's testimony did was related, already admitted evidence, showing that those returns were false to the allegations that they were false in the indictment. And this court's precedent expressly allows for that. In the Baker case, a case involving a complicated type of fraud, channel stuffing, there was similar testimony that related admitted evidence charges to charges in the indictment. In a fraud case, it involved falsehoods. And, similarly, in the Stevens case, another case involving fraudulent loan applications, where evidence and summary charts and testimony was tied specifically to indictment counts alleging that loans were false. A defendant claims, also, that Agent Luker somehow improperly bolstered the credibility of Frank McWhorter. But Agent Luker never testified that the jury should believe McWhorter. And this court's precedent does, in fact, require an express statement that another witness should be believed to make out a claim of improper bolstering. The Price case, which defendants submit supports his claims here, there the agent said, you know, I believe them. He used the word believe in reference to the government's other witnesses in that case. And in the Moore case, where the defendant made a claim that's at the bottom, really similar to the one that the defendant is making here, this court rejected a bolstering claim that was based merely on the fact that the agent had recounted the trial testimony of other witnesses. And this court pointed to Price and said, you know, look, there was no express statement. I would add that, you know, none of the statements the defendant points to in his reply brief as constituting, I mean, tantamount to bolstering even come close to making a statement to the jury that they should believe McWhorter. Two of those statements don't even mention McWhorter. One of them is, one of them is a statement about, one of them is a statement about one of the defendant's tax returns, which was already admitted into evidence. And another was, another was a statement about what happened, you know, about what McWhorter did or what Agent Luker did in his investigation. Well, I mean, the defendant, you know, the defendant also argued here before you today that Luker basically took the stand and said, hey, the defendant's guilty. That never happened. You know, there's no express statement to that, to that effect in Agent Luker's testimony. You know, he never said, you know, he never expressed an opinion about the defendant's guilt in total and never expressed an opinion about the defendant's state of mind, which is really the contested, his willfulness, which is really the contested element here at trial. The defendant also suggested in his argument that this court's precedents somehow require, you know, somehow restrict a summary witness to test, you know, to summarizing evidence that's not contested. You know, the defendant doesn't offer you a citation for that because I don't think this court's precedents require that. Instead, this court has recognized that, you know, summary, summaries don't have to be complete. The government can selectively summarize evidence. Agent Luker here was subject to cross-examination. Very able, his very able counsel, you know, took advantage of that opportunity to cross-examine Agent Luker and point out other evidence that came in during the trial and a lot of it that came in, you know, through his cross-examination of Frank Gorder that was favorable to his case. Counsel, one of the facts in this case apparently is that there was listed a possible expert witness by the government who was not called. It would seem to me in testimony that's being offered here by Agent Luker, some of that would have been less objectionable had it been offered by an expert witness. Is there any sense here that by allowing this particular summary witness, we would be broadening what is a fairly limited use of summary witnesses that the Fifth Circuit's recognized? Just a non-expert witness, I mean. Well, Your Honor, I don't think that that's the case here, first of all, because here I think, you know, even to the extent that Agent Luker was making claims about items that, you know, things that were on the tax returns issue here and, you know, the evidence that showed that some of that reporting was false. I think in this case, you know, he really was, you know, basing that on other testimony that came in during trial. You know, a lot of the false items alleged here were just, you know, it was just that, you know, a statement on their return was false. You know, John McGovern, you know, claimed deductions for these, you know, payment, claimed deductions as, you know, associate fees and, you know, fee sharing expenses essentially for these payments that really went to his life insurance policies. And, you know, the evidence at trial offered before Luker ever took the stand, you know, established that those items were false. You know, and in some other instances, you know, the jury, you know, needed to, you know, needed to know something about how the, you know, how some of that false reporting, you know, affected other returns. But here, the jury got that from other witnesses before Luker took the stand. So, for instance, those false deductions on John Lee's corporate returns, they gave rise to, you know, underreporting of income on John Lee's personal returns. And that was the basis for the accounts relating to those personal returns. But that effect was already testified to by my trial witness Dawn Jones, who was one of the accountants who worked on the Lee account at Defendant's Firm. And you can find her testimony on this at pages 602 to 604 of the record, where she testified that, you know, because those, you know, because those checks to Jackson were falsely deducted, that had a flow-through effect on the defendant's return. So I would submit that on this record, no, it wouldn't be expanding it. However, if this Court did think that, you know, that that was, you know, that maybe in a couple instances, Agent Luker crossed the line, you know, I don't think that that gives rise to any reversible error here. I mean, as the defendant noted, you know, the government did give notice that it might give expert testimony through another witness who ultimately wasn't called. You can find that at pages 90 to 93 of the record, that notice. And, you know, the defendant, having the benefit of that notice, noticed his own tax expert. You can find that, I think, at pages 120 through 123 of the record. He never called, but that shows that, you know, he was on notice, that there might be, you know, testimony in the tax area of an expert nature. And, you know, he wouldn't have been prejudiced in his ability to meet that evidence if, in fact, there were some little bits of evidence that crossed the line into expert testimony. And, moreover, you know, I think, you know, any error in giving, you know, expert opinions here, you know, is also, well, it's alarming simply because the evidence in this case was overwhelming, as the District Court expressly found in rejecting the defendant's claim for a new trial. What about the District Court statements that led the jury to believe that Mr. Nicholson himself would testify or that he would put on a defense, and he did not? And even after the District Court admonished the jury that he didn't have to, the Fifth Amendment didn't require him to, and he said, but I'm giving you the opportunity to. Doesn't that have some deleterious effect on the jury? They're expecting to hear from him, and they don't. It's as if, well, the government has spoken so loudly and so convincingly, what can he say? Well, I mean, as the defendant, I mean, you know, that remark was inadvertent. And I think also if you go look at that remark in the record, you'll find, I mean, he didn't, you know, the District Court didn't, you know, didn't specifically suggest that Mr. Nicholson was going to testify. You know, and the District Court, you know, error was brought to the District Court's attention. When you come back, the defendant will begin presenting his case in chief. He'll be called, will call the witnesses that he intends to call in his case in chief. Yeah. So, I mean, again, I don't, you know, I mean, to the narrow issue of whether that, you know, he's going to, you know, he himself is going to testify, you know, I don't think it suggested that. But, yes. Although Mr. Nicholson is not required to present evidence, I'm giving him the chance. And it's like, well, you had your chance and you didn't take it. That's because you couldn't defend yourself. I mean. Well, so with respect to the, I mean, with respect to the curative instruction that the District Court gave afterwards, you know, I mean, if Your Honor is suggesting that, you know, because it said in essence, you know, you don't have the right, you know. But you'll have the opportunity, but you don't have to put on a case. That was in essence the curative instruction that the defense said that he wanted after that. So the District Court, I mean, you know, it was a passing remark. You know, the District Court, you know, immediately when the jury came back, addressed it, made clear that, you know, the defendant didn't have any obligation to put on a case. As a defendant, you know, this Court had already told the jury in opening instructions and some later told again in closing instructions. So, and the District Court directed the jury to disregard that remark, and the District Court even pulled the jury and asked them, you know, jurors, you know, can you follow my instruction to disregard that? And they all affirmed that they could. So I think, you know, nobody's, you know, nobody was suggesting that, you know, that that, you know, that that was an appropriate remark for the District Court to make. But, you know, did it on this record have any, you know, have any deleterious effect on the defendant's rights? I think not. It was a passing remark. It was immediately addressed by the District Court and all the other instructions that the District Court gave, you know, made clear that the defendant had, you know, didn't have a burden of proof and didn't have any obligation to put on a case or testify. If there are no further questions, I ask that you affirm the judgment of the District Court. Thank you. Just to address a few points raised by Mr. Severson, suffice it to say we disagree that Bradley Luker confined or constrained himself to be a fact witness and just a summary witness. He clearly offered expert testimony when he gave opinions at all related to nominee income and how it should be reported on a tax return and how Mr. Nicholson had run afoul of the calculation related to his outside basis. The government itself maintains in its brief that John Lee's $66,000 in checks was not for AR. That is 180 degrees opposite than what their witness said at trial. Whether anybody believes him or not, quite frankly, I don't know. You know, Mr. McWhirter, in offering up his opinions about whether or not a particular request for reimbursement was reimbursable or not, said that that's my opinion and anybody that you might ask would be different. There was no uniform reimbursement policy that any witness identified at trial. This was truly the world according to Frank as regurgitated by Agent Luker. The government seems to be saying that there was ample evidence in this case to support a finding of guilt. Well, I disagree, but even if there is, that's immaterial under the holdings that we identify in our brief. There's probably ample evidence in a drug case where the fruits of the search were suppressed and nonetheless admitted improperly before the jury. There might be sufficient evidence. You might have sufficient evidence in a case where a confession is coerced. But that can't be the kind of proof upon which a conviction can rest. The rules of evidence and particularly their interpretation by this court are clearly within the domain of the members of this court that sit and render opinions. The evolution of Rule 1006 is a creature of case law. One need not read long to see that it has become more and more lax. I ask you to do what you did in heart to say no. No to basically a one witness trial. No to witnesses who have not been designated as experts offering expert testimony. No to the mischaracterization of testimony. And no to witnesses adopting that of other witnesses and advocating from the box. You can do something about that, and I'm asking you to. I thank you. Thank you, Counsel.